Edward McGuire

*vs.*

Richard C. Briscoe

In Equity.   Decided June 21, 1851.

*Motion for costs on overruling a demurrer, and Bill to set aside a sale at Auction.*

1. Where a demurrer to the bill is overruled, or is sustained in part, the Court declined to allow costs to either party, remarking that this Court has no recollection of requiring the payment of five pounds, required by the statute of Maryland.

2. Where one has knowledge of the insolvency of a party, an agreement to pay him a part of the purchase money of property, held by an assignee under the insolvent laws is void as to creditors.

3. That at a sale under a deed of trust the following circumstance, with others mentioned, was considered of sufficient importance to set aside the sale and decree a re-sale of the property. A party interested in the sale, in the hearing of the auctioneer and the persons attending the sale, stated that he had a deed for the property, and that any person purchasing would be subject to a suit at law; that the sale under the trust deed was a mere legal form to perfect his title.

*Motion for costs on overruling a demurrer.*

See bill, answer and demurrer as given in this opinion and that of the decision of Judge Morsell, setting aside a sale at auction under a deed of trust.

I think, says Judge Dunlop, that the demurrer should be sustained as to so much of the bill as seeks to discover how much the defendant paid to Wall and Cascer, and to the legal representative of James McCormick, and to the defendant having warranted McCarty.

And to be overruled as to the failure or refusal of the defendant to pay to McCarthy the balance of the purchase money in goods. See as to Multifariousness, Story Equity Pleading, Sec. 284.

Rule by the Court that the defendant put in a further answer to the complainant's bill.

The defendant thereupon put in the following further answer to the complainant's bill.

The further answer of the defendant to the original bill of complaint:

This defendant, saving and reserving to himself the same benefit of exception to the said original bill as by his former answer to the said original bill, is saved and reserved for answer thereto saith :

That he, this defendant, hath fully complied with and satisfied the said McCarty the full sum of $1500, the purchase money of the said leasehold premises in said bill mentioned; that he hath paid and taken up the said judgments and claims of the estate of James McCormick, also the claims held by Ulysses Ward and Wall and Iasser, which he is ready to release and satisfy to said McCarty, on his being made secure in his said purchase, and the residue thereof he hath fully accounted for and settled with the said McCarty, partly in dry goods and partly in debts due and owing to him by said McCarthy for dry goods, which he agreed to allow this defendant on said settlement; and the said McCarthy did, in the month of May or June, 1845, declare himself fully satisfied and content therewith, but this defendant does not know that he can show all the particulars of said settlement, yet offers himself ready to prove by indifferent testimony, if the same shall be denied by said McCarthy, that he did in fact in the said month of May or June, 1845, fully pay and satisfy to him the said balance stipulated by this defendant in and by his said agreement, to be paid for the purchase of the said leasehold, &c.

The following exceptions were taken by the complainant to the above insufficient further answer of the said defendant to his said complainant's bill. For that the said defendant hath not, to the best and utmost of his knowledge, remembrance, information and belief, answered and set forth whether he, the said defendant, " hath supplied and allowed said McCarthy to select any goods from the store of the said Clarke & Briscoe. If so to what amount? and what kind of goods? and produce and set forth a bill of the same."

In all of which particulars the said complainant, except to the said further answer of the said defendant as evasive,

imperfect and insufficient, and humbly prays that the said defendant may be compelled to put in a full and perfect answer thereto.

The complainant thereupon moved for costs on overruling the demurrer and for the penalty of £5 under the statute.

Judge Branch's opinion: The demurrer to the defendant's first answer having been sustained in part and overruled in part, I think each party should sustain his own costs incurred by the demurrer, that is that neither party should recover of the other any costs of demurrer.

I have no recollection that this Court has ever required the payment of the £5 required by the Maryland Statute.*

The following is Judge Cranch's decision overruling the demurrer to the answer.

1. This is a demurrer to the defendant's further answer, because he says that "he does not now know that he can show all the particulars of said settlement."

But he says that he "has fully complied and satisfied the said McCarthy the said full sum of $1500, the purchase money of the leasehold premises, in the bill mentioned," and "offers himself ready to prove by indifferent testimony that he did, in May or June, 1845, pay and satisfy to him the balance," &c.

This seems to me to be as full an answer as can reasonably be required.

I therefore am inclined to think that this last demurrer should be overruled, but without costs. Is the defendant bound to exhibit a bill of particulars of the goods supplied to McCarthy? I doubt whether he is bound.

Bill to set aside a sale at auction.

Opinion of Judge Morsell:

The bill in this case was filed by Edward McGuire as

---

*That upon any demurrer or plea being overruled upon argument, or otherwise being withdrawn without leave of the Chancery Court, the party whose demurrer or plea is so overruled or withdrawn shall pay to the opposite party the sum of five pounds current money, and the costs thereof, and be in contempt until the said sum of money and costs are fully discharged and paid.   Act Md., 1785, Ch. 72, Sec. 25.

trustee under the insolvent law, appointed in the case of John McCarty, an insolvent debtor, on behalf of the creditors of said McC. against Richard Briscoe.

The bill states that McC., on the 17th of Aug., 1836, purchased of Frederick May, since deceased, a leasehold interest in a lot or parcel of ground in the city of W., numbered 29, in square "B," for the term of 99 years, he paying therefore an annual ground rent of one hundred and fourteen dollars and ninety cents, with the privilege at any time during the said term to purchase the fee-simple title in said premises for the sum of $1915, on which premises said McC. erected a two story brick house at the cost of about $2000; that on the 20th of April, 1844, he conveyed all his interest in said leasehold premises to Edward Simmes and Richard E. Simmes, in trust, to secure the payment of three hundred and ninty-three dollars and thirty-four cents to Ulysses Ward, to whom he was then indebted, with power to said Trustees in case of failure to pay the same in 12 months from the date of said conveyance, to sell the same at public auction.

That on the 4th of June, 1844, he obtained the benefit of the Act of Congress for the relief of insolvent debtors within the D. C., that according to the provisions of said act, he did on the said 4th of June, 1844, convey and transfer to said McG., for the benefit of his creditors, all his property, real, personal and mixed, and all his claims, rights and credits. From the insolvent papers, in which case it appears that the premises aforesaid were returned in his schedule as a part of his real property, and by the certificate of said McG. as trustee, that the same were delivered to him on said 4th day of June, 1844; it further appears thereby that said McC. returned, among those which are stated, several other creditors besides the said Ulysses Ward and Wall and Saggar and Jas. McCormick for whose debt he was imprisoned.

The bill proceeds in substance to state and charge that afterwards on Feb. the 17th, 1845, Richard G. Briscoe the defendant, knowing the premises, and conniving with said McC. did fraudulently and with the intent to defraud the said McC. and his said McC's creditor, make a secret agreement in writing with said McC., wherein the said Briscoe promised

to pay the said McC. the sum of $1500, in consideration whereof the said McC. agreed to convey the premises aforesaid unto the said Briscoe, that the said sum of $1500 was agreed to be paid in manner following: 1st. To pay the said debt of $393.35 and interest thereon due to said Ulysses Ward and secured as before mentioned. 2nd. To pay about $250 and interest thereon due Messrs. Wall and Saggar, for which they had obtained a judgment. 3rd. To pay the sum of about $350 and interest thereon due to one Jas. McCormick, for which the said McC. had obtained a judgment, and the balance, which was computed to be about $300, was to be paid by said Briscoe in such goods as the said McC. should think proper to select from time to time out of the stock of merchandise in the store of said Briscoe. There are some variances between the original agreement exhibited in the case, and as it is stated above in the bill, but it is supposed not materially to effect the principles of law, which will be declared in the decision of the case. The bill avers that the defendant, well knowing the fact that said McC. had no legal or equitable right to sell said premises, entered into the contract aforesaid, with the covenous intent of obtaining the same at an unreasonable sacrifice, to the great detriment of the creditors of said McC., and that at various times after said agreement was drawn up said complainant informed said defendant that said McC. was an insolvent debtor; had no right to enter into said agreement, and that any money he, the said Briscoe might pay said McC. on account of said agreement would be thrown away by him, the said Briscoe. That in pursuance of said agreement, said McC., on the 17th of Feb., 1845, did by deed, duly executed, convey said premises, for the consideration aforesaid, to said Briscoe, and therein empowered said trustees, with the assent of said Ulysses Ward, to convey said premises, free and clear from said trust, or to convey the same subject thereto, that well knowing said deed was a nullity, because of said prior deed under the solvent law. Said Briscoe covenously, and with intent to *defraud* said McC. and his creditors, advised and agreed with McC. that neither he, the said Briscoe, nor McC. should pay off the said debt so secured, but should fail so to

do, and they cause a sale of said premises at public auction by the trustees under said trust deed, at which said sale, he, said Briscoe, should become the highest bidder, and with a view to prevent said premises from bringing a full and fair price at said auction sale, it was arranged between them that not more than $1000 should be offered for the same, that is, that the said Briscoe should bid the said sum of $1000. In compliance with which arrangement said McC. made known to his friends and acquaintances generally, that he had sold said premises by private contract to said Briscoe, and that the public sale by auction, under said trust deed, was a mere legal form to perfect the title of said Briscoe, which arrangement became publicly known prior to and at the time of said auction sale, which took place on the 17th of May, 1845; that said McC. designedly absenting himself. In consequence of the common notoriety of said private sale, many persons refrained from attending the said auction, and of the few who did attend, but one made a bid for the said premises. That said Briscoe, to effect his point at the time of said auction, at the premises aforesaid, and in the hearing of the auctioneer and all the persons then and there attending, publicly declared and stated that he, the said Briscoe, had a deed for the property, and also the lease of Dr. May, meaning the lease executed as aforesaid by said Frederick May, deceased, and that any person purchasing would be subject to a suit at law. In consequence whereof, the said premises, at the lowest cash valuation worth $2000, were struck off to said Briscoe as the highest bidder at said auction for the sum of $730, and on the 8th of July, 1845, the trustees aforesaid executed and delivered a valid deed of conveyance (I suppose as to the form of execution) conveying to said Briscoe all their right and title and interest in the premises. Complainant further charges that after the execution of said last mentioned deed, the said Briscoe, believing himself in condition to carry into effect the fraudulent schemes which complainant charges were being plotted by said Briscoe at the time of the execution of the said private contract, paid off, it is true, the entire debt due, and secured as aforesaid to Ulysses Ward, amounting to about $450; but instead of liquidating the entire debt due by said

McC. to said Wall & Saggar and to said Jas. McC., the said Briscoe compromised with them at the rate of fifty cents on the dollar, &c., (to this part of the bill the defendant demurred, and the Court sustained his demurrer). The bill charges also that he has failed and refused to permit the said McC., according to the terms of the contract, to take out the sum of $300 in goods as aforesaid, &c., except about the sum of about $47. The complainant avers and believes that the object of the defendant, at the time of entering into said contract, was by fraudulent means as aforesaid to purchase the said property, at an unconscionable sacrifice, to the detriment of said McC. and his creditors; that at the time of entering into said contract he well knew that said McC. was an insolvent, and had no interest at law or in equity in the premises, by reason of which actings and doings many of the creditors of said McC. have been defrauded of their just dues.

The prayer of the bill is in the alternative. First, that a resale of the premises may be decreed, and an account taken of the rents and profits thereof during the time said premises have been in the possession, or under the control, or vested in said Briscoe, and that the purchase money arising from said resale may be applied, first to the repayment to the said Briscoe of the monies expended by him in liquidating the said debt due to said Ward, and to so much of the said respective judgments as has been actually paid by him, and legal interest thereon, deducting therefrom the amount received, or that might have been received by said Briscoe, but for his willful default or neglect from said premises. And second, that the balance of said purchase money be paid over to said complainant as trustee as aforesaid, to be by him distributed among the unsatisfied creditors of said McC. pro rata, each in proportion to the amount of his claim, or a decree that said Briscoe shall stand seized of the said premises as trustee for the use of said complainant as insolvent trustee as aforesaid, the said trust to extend to the sum of three hundred dollars, contracted by said Briscoe, to be paid to said McC., in goods as aforesaid, and interest thereon, and to pay any sum of money that may be found to be the difference between the full amount of the judgments aforesaid, and interest thereon contracted, to be

paid by said Briscoe for said McC., and the sum of money actually paid in liquidation of said judgments by said Briscoe, and that if the said Briscoe shall not satisfy the said trust by paying the said sums of money to said complainant within a certain time, to be limited by decree, that a sale of said premises may be ordered, &c.

The answer admits the leasehold interest as stated in the bill; denies the enhanced value by improvements as stated by complainant; that it is also true as stated with respect to the existence of the debt due to Ulysses Ward, and that there is also due to him the additional amount of $30, which was also meant and intended to be secured on the same property. He admits the insolvency of McC. as stated, and of the conveyance of all his property to complainant as trustee for the creditors of McC. under the insolvent law; admits a constructive notice thereof, but denies that he had any notice in fact at the time of the agreement between him and McC., for the purchase of the premises mentioned in the bill, which agreement is marked defendant's exhibit, No. 1. That said McC. was in the actual enjoyment of said premises, and assured this defendant the said premises were, with the exception of the said deed of trust to Ward, entirely free from any incumbrance. That he has reason to believe, and does believe it to be true, that complainant knew that said McC. was negotiating with defendant, yet stood by and did not in any manner interpose or notify him of his claims upon said property until the agreement between McC. and him was consummated. That although, as appears on the back of the schedule, McC. returned a list of his creditors, there is not and has not been on file in the insolvent proceedings a single claim or demand by any one of the said creditors, nor is there anything there except the said list to show that he was in fact indebted to any of the said persons, nor is there anything to show the amounts. That he is ready to prove that if said McC. was indebted to any of said persons at the time of said insolvent's discharge, that either he, said McC., or some other person, other than said insolvent trustee, hath fully settled the said debts, except said Thos. Griffin and said Bradly & Estep; and that as to said Thos. Griffin, said McC. had then an

account in bar against his demand, and that he hath been informed by said McC. that he was about to settle with said Bradley & Estep, at or about the time of said contract. He denied that there are any debts now due by said McC., for the payment or satisfaction of which the holders thereof could or can look to the property conveyed by said McC. to said insolvent trustee; this defence he relies on as if pleaded. He denies all connivance with McC. to defraud the said creditors. That there was no secrecy about the agreement, but that it was as open as contracts for sale and purchase of land usually are, states the agreement, as it appears by exhibit No. 1. That the whole purchase money was to be $1500. That he was left free to make the best terms he could with the respective claimants named in the agreement. McC. was to allow them so much money, without any regard to the amount defendant might give for them. The amount of which debts and the arrears of taxes due, exclusive of said $300 to be paid in goods to said McC. on the 15th of February, 1845, was $1305.60, which he hath fully satisfied, and hath received from each an assignment. He denies that complainant gave him the notice of McC.'s insolvency, as stated in the bill, until after said defendant had entered into said agreement, and had, under the same, paid a part and given his obligation for the residue of said claims respectively, and received the assignments of them. He believes, as before stated, that trustee was cognizant of the said treaty for said purchase, and had become liable to said parties, and that said amount paid was less than the claims respectively; that the notice given under the circumstances aforesaid was with a view to cheat and defraud the defendant, and to deprive him of his just gains on said contract. He admits the execution of the deed by McC. to him, and believes it was known to complainant before he gave his said notice; claims it was a nullity with respect to the allegations respecting the agreement between him and McC. not to pay off the said debt to Ward; and respecting the bidding at said sale, he avers that the whole statement thereof is a tissue of falsehoods; that for his protection, and as he was advised, he admits that he purposely delayed the payment of said debt, as there was no other mode

to protect himself against loss by the fraudulent collusion between the said complainant and McC., and that the said Ward, at the instance of the said defendant, or as his assignee, did require Messrs. E. & R. Simms, trustees in said deed named, to sell the said property, and the same was accordingly sold and purchased at said sale by this defendant, at and for the sum of $730; denies that there was any agreement between him 'and McC. limiting the amount of the bidding, or to control or regulate the same; nor that McC. should make known among his friends and acquaintances generally that he had sold said premises by private contract to said defendant, and that the public sale was a mere legal form to perfect the title of said defendant, though if such had been the case the defendant maintains it would have been perfectly fair; nor does he know that the said McC. designedly absented himself from the said sale; nor does he recollect whether he was there or not, but if he was absent there was no understanding or agreement between them that he should be so. He denies that in consequence of the notoriety of the private sale aforesaid many persons refrained from attending said sale. He avers, and is ready to prove, that there was a good company at said sale, and several bids were offered for the property. He admits that he did, at said sale, in presence and hearing of the auctioneer—and he supposes of all others who were present—publicly declare and state in substance what is alleged in the bill; he will not be positive of the words, they were, as well as he recollects, accurately taken down in writing by the auctioneer. He denies that by any contrivance and threats alleged as employed by him, the premises (at the lowest cash valuation worth $2,000), were struck off at said sale and sold to said defendant for $730. He admits that he was the highest bidder at that sum, and that they were struck off to him at that sum. He says they were not worth anything like $2,000 in cash, and that he would never have bought them at $1.500 but for the mode of payment and the prospect of his being able to buy up the claims at less than their full amount. It is also true that the trustees have conveyed the said property to the defendant; also that he has paid off said debt to said Ward, together with the expenses

of sale. The following part is a demurrer, which in part was sustained. The amended answer to the part not sustained states that he, defendant, has fully complied with and satisfied the said McC. the full sum of $1,500, and that McC., in the month of May or June, 1845, acknowledged himself fully satisfied and content therewith. The said $300 to be paid to said McC. he hath fully accounted for and settled with said McC., partly in dry goods and partly in debts due and owing to him by said McC. for dry goods, which he agreed to allow defendant, &c.

The agreement between McC. and the defendant Briscoe, for the purchase and sale of the property mentioned in the bill, was entered into on the 15th of February, 1845. It was a leasehold interest for ninety-nine years, renewal forever, in part of lot No. 29, in square B, in the City of Washington, at an annual ground rent of $114.90, with the privilege at any time during the term to purchase the fee-simple title for the sum of $1915, granted to McC. by Dr. Frederick May, on the 17th of August, 1836, one of the terms of which agreement was that McC. should be paid $300 in goods. The deed for the property from McC. to Briscoe was dated the 17th of February, 1845. McC. had been released under the insolvent law of this district, and the complainant appointed trustee for the benefit of the creditors on the 4th of June, 1844, about eight months before. Some of the creditors returned with his schedule are still unpaid. The terms in the deed to the trustee under the insolvent law are co-extensive with those used in the law, which are sufficiently comprehensive to transfer any and every interest which the insolvent could have had. The terms are "all my property, real, personal and mixed, to which I am in any manner entitled, in possession, reversion or remainder, and all my rights, claims and credits, of what nature or kind soever." If, therefore, the party grantor in a deed of bargain and sale can transfer or pass only such interest as he has, what interest in the premises had McC., the grantor, at the time of his agreement and deed to the defendant Briscoe? It has been contended that he had an interest in a resulting trust, which the defendant had a right to think existed at the time, and that he had a right,

and did purchase an outstanding incumbrance for the purpose of perfecting his title, and by that means he hath perfected his title; that the creditors so returned by McC. cannot set up or sustain their claim. First, because they have not been made parties to the suit; or second, that their claim to look to the premises for payment has been lost by the laches of the trustee, and the presumption that they were paid.

As to the first objection I think it is sufficiently answered by the 6th section of the insolvent law, which is, "That every trustee may sue for in his own name, any property, or chose in action, assigned to him by virtue of this act." He must be considered as the representative of the creditors, and he has stated in the bill that it is filed on their behalf. See 8 Cranch, 36[1] Ch. Justice Marshal, in a case under the insolvent law, where a similar objection was made, says: "In reason there can be no difference between this suit, which asserts the right of the creditors in the mode prescribed by law, and an assertion of that right in their own names, nor does the law distinguish between them."

With respect to the second ground. The absence of notice, in fact of the release. under the insolvent law, and the misconduct of the trustee. The circumstances as before stated were:

1. That McC., the insolvent, was permitted to remain in the actual enjoyment of the premises, and that he assured defendant that the premises were, with the exception of said deed of trust to Ward, free from any incumbrance, &c.

2. That trustee knew that said McC. was negotiating with defendant, yet stood by and did not in any manner interpose, or notify him of his claim on said property until the agreement was consummated.

3. That the list of creditors returned does not show any particular amount due, nor have any one of them made or demanded any single claim, and that he will be able to prove that they were all paid, &c.

It cannot be deemed necessary, I think, to sustain the claim of the complainant to recover in this case, to show that

[1]The Bank of Washington *vs*. Herbert.

notice in fact was given to the defendant before he entered into the contract for the purchase of the premises, that McC. had been released under the insolvent law.   The only notice required is that which is directed to be given by the judge's order of the application, to be published in some of the newspapers for such time as he may think proper, &c.   This, it appears by the insolvent papers, was done by publication in the *National Intelligencer*, according to law.   If he was a creditor, as the proof states him to have been, and resided at the time in the City of Washington, the presumption is very strong that he had notice in fact, which perhaps had escaped his recollection.   Be that as it may, he had all the notice which the law requires, and was as much bound as if he had had notice in fact.   With this notice he was bound to know not only of McC's insolvency, but of the list of creditors returned on the back of his schedule, and although the amount of the debts were not stated, the list stated as much as the law required, and enough to put the defendant on the enquiry of those who could have given him authentic information; it was therefore his own folly to rely upon what McC. told him.

With respect to the supposed ground upon which it might be presumed that the trust was extinct, arising from the acts or negligence of the trustee under the insolvent law, in permitting the insolvent McC. to remain in the enjoyment of the premises, and not interposing or notifying defendant of his claims before he had consummated his purchase and become bound to Ward and others for the payment of the debts due to them, though he knew of the negotiation, &c.

It will be proper to advert to what the facts really were as proved (the premises were occupied by two tenants O'Leary and Barber) from the time of the release under the insolvent law to the date of the agreement for the purchase and sale, was, as has been already stated, little upwards of eight months before the trustee could sell.   The law required him to obtain the Judge's order, and although perhaps the trustee may be chargeable with some degree of negligence, there is no very unreasonable delay.   There is no evidence to show who received the rent, or whether any was actually due in the interval.   As to the other circumstances, it is not proved that

he did know of the negotiation. It is stated only in answer as of the belief of the defendant. It is admitted that he, defendant, had notice before he had paid the obligations which he had come under on account of said purchase.

But if the facts were as stated in the answer, and this, instead of being a case of special and resulting trust, were a case of a trustee having general powers, how would the law be? The rule of law is, that regularly no act of the trustee shall prejudice the *cestui que trust*, but the trustee must especially in equity make good the trust, and into whosoever hands the property comes, in case of a breach of trust, it will be charged with the trust, except in a case where having the legal estate, and being in possession, the trustee aliens and conveys the property for a valuable consideration and without notice, and so also as to the incumbrances. Mortgagees for a valuable consideration, and without notice of the trust, are to be considered as purchasers—a mortgage being a specific lien. See 2 Fonbl. Eq., Ch. 7, Sec. 1, p. 170, and note (a), and the authorities there cited. According to this view it is supposed the trust could not be considered extinct.

It may also be observed, as already stated, that the defendant, having knowledge of the insolvent circumstances of McC., the agreement to pay him a part of the purchase money would make the contract void as to creditors, according to the recent decision of this Court.

The next and last point to be considered is what effect is to be given to the sale, by the trustees, under Ward's deed, in, trust?

It has been contended that the defendant had a right to purchase an outstanding incumbrance to perfect his title, and that the sale by the trustees under said deed, and the purchase at that sale by the defendant has perfected his title. That where the equities are equal, as it respects the claim of two purchasers, the subsequent equitable owner, without notice, is perfectly justifiable in purchasing in the legal title, so as to obtain a superiority, I have no doubt, and having so done a Court of equity will never disturb him in his right. But that certainly was not this case, because, according to the principles which I have already endeavored to establish, the

defendant had notice, and the insolvent McC. had no present interest that he could pass by a bargain and sale, and because the only legal interest that Ward could convey was subject to the equity of redemption contained on the face of the deed itself, which by operation of law was vested, prior in point of time, in McGuire, the trustee under the insolvent law, for the benefit of the creditors.   The right in the equity of redemption being then clearly established in the trustee, for the benefit of said creditors under the insolvent law, it follows that any valid sale and purchase under Ward's deed, either for his own benefit or for that of his assignee, must be something more than a mere formal sale to unite the legal with the equitable interest.   Such a sale must have been strictly in compliance with the terms contained in the deed, openly, really and fairly, at public auction to the highest bidder. Was such the character of the sale in the present instance? It was admitted that it was made by the trustees, at the request of the defendant, and that the defendant was to bear the expenses attending the sale; that neither of the trustees attended the sale, and that they were to have no further trouble with the matter than to sign a deed.   The bill states several circumstances of unfairness on the part of the defendant connected with the sale, but which are denied by the answer, and not sufficiently proved.   It however charges that Briscoe, to effect his end, at the time of the said auction at the premises aforesaid, and in the hearing of the auctioneer and all the persons then and there attending, publicly declared and stated that he, the said Briscoe, had a deed for the property and also the lease of Dr. May executed as aforesaid by said Frederick May, deceased, and that any person purchasing would be subject to a suit at law.

The answer admits the truth of said statement in substance, but as defendant did not positively remember the words, he refers to them as accurately taken down in writing by the auctioneer.   The auctioneer states that said Briscoe stated at the time and place aforesaid "that he *had a deed for the property*, as also the lease of Dr. May, *and that the property was sold to perfect his title*, and that any person purchasing would be subject to a suit at law."   The words above under-

scored were run through by two black lines on the auctioneer's book. The proof is that there were about ten or a dozen persons present; that no person bid for the property except O'Leary, the tenant, and the defendant Briscoe. One of the witnesses says, "that what Mr. Briscoe said at the sale had such an effect on his mind, that had he been disposed to bid he would have been prevented from doing so, and he has no doubt it had the same effect on others." He states, however, that he was there merely as a spectator, and with no intention of purchasing the property.

These, it is believed, are all the material facts on this point in the case before the Court, and it is thought offers an occasion to make a few general remarks on the subject of sales at public auction.

The public is supposed to be deeply interested that such sales should be conducted in good faith and entire fairness; that the articles set up for sale will be so disposed of as to bring the highest price from the highest real bidder which can be obtained; that the owner, whether real or nominal virtual should not be allowed privately to bid, for then, in the language of lord Mansfield, "there would be no end of that if the owner might privately bid upon his own goods. No fraud or imposition should be practiced by puffers or persons employed in that or a like character to induce persons to bid, or not to bid. Nothing should be done which might prevent honesty and justice from being done to all interested, by false representations or otherwise. It will be found, from a very early period, that the invariably fixed policy of the law, founded on these principles, has been to throw around those guards which would probably secure that important end, hence the inhibiting restraints imposed, disallowing owners, directly or indirectly, trustees and all agents, public and private, in the relations which vendor and vendee stand to each other, from bidding and purchasing at such sales, thereby effectually to secure a faithful discharge of the duty of trustees and others, without the probability of danger from personal conflicting interests." The modern case of Michoud *et al.* *vs.* Girod, decided by the Supreme Court in 1846, 4 How. 552, 553, recognize and approves of those early established

principles which I have just stated. In the present case the trustees, instead of acting as they ought to have done, according to the well established law on the subject, surrendered up the whole discharge of the trust and the control and management of the sale to the defendant, not even giving the benefit of their presence; and he, the defendant, by acts and declarations which, according to the views I have taken of the law, were falsely at the time of said sale claimed in amount to be the owner, and it appears more particularly by the evidence, that he used language on the occasion calculated to deter the few persons who were present from bidding. One of the witnesses present declares that the effect of such conduct on him was such, that had he been disposed to bid he would have been prevented from so doing. This and the other circumstances alluded to may have been the reason why the property was knocked down to him as the highest bidder at the sacrifice of $730. This, I think, was unfair conduct, and sufficient to set aside the sale.

It is decided in a late case of Fuller *vs.* Abraham, 6 Moore, 318, and 3 Broderip & Bingham, 116, that such conduct is sufficient to set aside a sale. The marginal note states the case correctly, and is in these words: "Held that a purchaser did not acquire any property under a sale by auction at which he and his friend were the only bidders, the rest of the company being deterred from bidding by the purchaser stating to them he had a claim against and had been ill used by the late owner of the article," and in Chitty on Contracts, p. 299, referring to this case and another of Phippen *vs.* Stickney, 3 Metcalf, 384, he says: "It has been decided in a late case that if a purchaser, by unfair conduct, deter other persons from bidding at the sale, and cause the goods to be knocked down to him, he does not acquire any property in the goods.

J. S. Mᴼᴿˢᴱᴸᴸ's Opinion.

The following decree was given in this case:

This cause standing ready for hearing, and being submitted, the counsel for the parties were heard, and the proceedings read and considered.

It is therefore, this 21st day of June, 1851, ordered,

adjudged and decreed that the sale made on the 17th day of May, A.D. 1845, of the premises mentioned in the proceedings, be and the same is hereby annulled and declared to be void, and that the deed executed in consequence thereof on the 8th day of July, A. D. 1845, by the trustees, Edward Simmes and Richard E. Simmes, and mentioned in the proceedings, be and the same is hereby annulled and declared to be totally void.

And it is further ordered, adjudged and decreed that the said premises be sold; that Walter D. Davidge, of the City of Washington, D. C., be and hereby is appointed trustee to make such sale, and that the course and manner of his proceeding shall be as follows: He shall first file in the clerk's office of this Court his bond to the United States in the penalty of $5000, with surety or sureties to be approved by this Court or a judge thereof, conditioned for the faithful performance of the trust reposed in him by this decree, or which may be reposed in him by any further order or decree in this cause. He shall then proceed to make sale of said premises at public auction, having first given at least four weeks previous notice by advertisement in the *National Intelligencer*, published twice a week for said four weeks, of the time and place and terms of sale, which terms shall be as follows: One fourth of the purchase money to be paid in cash, and the residue in three equal payments at six, nine and twelve months from the day of sale, the said deferred payments to bear interest, and to be secured by the bonds or notes of the purchaser, with surety or sureties to be approved by the trustee.

And as soon as may be convenient after said sale, the said trustee shall return to this Court a full report of the same, with an affidavit of the truth thereof, and of the fairness of such sale annexed. And on the ratification of said sale, and the payment of the whole purchase money, the said trustee shall convey to the purchaser or purchasers, his or their heirs and assigns, the premises sold, with all the right, title and interest therein of the parties to this cause. And the said trustee shall bring into this Court the money arising on such sale to abide its future order.

By order of the Court.

Test: John A. Smith, *Clerk*.